IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JEFFREY L. ANDERSON,                          6:15-CV-01319-BR

            Plaintiff,                        OPINION AND ORDER

v.

CAROLYN W. COLVIN,
Commissioner, Social Security
Administration,

            Defendant.


**RICHARD F. MCGINTY**
McGinty & Belcher, Attorneys
P.O. Box 12806
Salem, OR 97301
(503) 371-9636

        Attorneys for Plaintiff

**BILLY J. WILLIAMS**
United States Attorney
**JANICE E. HEBERT**
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1011

1 - OPINION AND ORDER

**DAVID MORADO**
Regional Chief Counsel
**JUSTIN L. MARTIN**
Special Assistant United States Attorney
Social Security Administration
791 Fifth Avenue, Suite 2900, M/S 221A
Seattle, WA 98104-7075
(206) 615-3735

       Attorneys for Defendant

**BROWN, Judge.**

       Plaintiff Jeffrey L. Anderson seeks judicial review of a final decision of the Commissioner of the Social Security Administration (SSA) in which she denied Plaintiff's applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. This Court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

       Following a review of the record, the Court reverses the decision of the Commissioner and remands this matter pursuant to Sentence Four, 42 U.S.C. § 405(g), for the immediate calculation and payment of benefits to Plaintiff.

## ADMINISTRATIVE HISTORY

       Plaintiff protectively filed his applications on August 8, 2011, and alleged a disability onset date of June 29, 2009.

Tr. 198-201, 229, 240.[1]  The applications were denied initially and on reconsideration.  An Administrative Law Judge (ALJ) held a hearing on August 16, 2013.  Tr. 39-92.  At the hearing Plaintiff represented himself.  Plaintiff and a vocational expert (VE) testified.

The ALJ issued a decision on September 11, 2013, in which he found Plaintiff is not disabled.  Tr. 14-38.  That decision became the final decision of the Commissioner on May 14, 2015, when the Appeals Council denied Plaintiff's request for review. Tr. 1-4.  *See Sims v. Apfel,* 530 U.S. 103, 106-07 (2000).

On July 16, 2015, Plaintiff filed a Complaint in this Court seeking review of the Commissioner's decision.


**<u>BACKGROUND</u>**

Plaintiff was born in August 1961 and was 49 years old on his alleged onset date.  He completed four or more years of college and has a degree as a registered nurse.  Tr. 241, 968. Plaintiff has a radiology limited license and certifications as a nursing assistant, medical assistant, and paramedic.  Tr. 241, 968.  Plaintiff has past relevant work experience as a registered nurse at an adult corrections facility from 1996 to 2009. Tr. 232.

---

[1]  Citations to the official transcript of record filed by the Commissioner on November 23, 2015, are referred to as "Tr."

Plaintiff alleges disability due to "bipolar, adjustment disorder, PTSD, chronic knee pain, left meralgia prasthica, left ulnar neuropathy, left pre-op trigger finger, chronic left shoulder impingement, L4-5 disc compression, high bp."  Tr. 240.

## STANDARDS

The initial burden of proof rests on the claimant to establish disability.  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).  To meet this burden, a claimant must demonstrate his inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The ALJ must develop the record when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.  *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011)(quoting *Mayes v. Massanari,* 276 F.3d 453, 459-60 (9th Cir. 2001)).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g).  *See also Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1161 (9th Cir. 2012).  Substantial evidence is "relevant evidence that a reasonable mind might accept as

adequate to support a conclusion." *Molina*, 674 F.3d. at 1110-11 (quoting *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009)).  It is more than a mere scintilla [of evidence] but less than a preponderance. *Id.* (citing *Valentine*, 574 F.3d at 690).

The ALJ is responsible for determining credibility, resolving conflicts in the medical evidence, and resolving ambiguities. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  Even when the evidence is susceptible to more than one rational interpretation, the court must uphold the Commissioner's findings if they are supported by inferences reasonably drawn from the record. *Ludwig v. Astrue*, 681 F.3d 1047, 1051 (9th Cir. 2012). The court may not substitute its judgment for that of the Commissioner. *Widmark v. Barnhart*, 454 F.3d 1063, 1070 (9th Cir. 2006).


## DISABILITY ANALYSIS

At Step One the claimant is not disabled if the Commissioner determines the claimant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I).  *See also Keyser v. Comm'r of Soc. Sec.*, 648 F.3d 721, 724 (9th Cir.

2011).

At Step Two the claimant is not disabled if the Commissioner determines the claimant does not have any medically severe impairment or combination of impairments.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  *See also Keyser*, 648 F.3d at 724.

At Step Three the claimant is disabled if the Commissioner determines the claimant's impairments meet or equal one of the listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  *See also Keyser*, 648 F.3d at 724.  The criteria for the listed impairments, known as Listings, are enumerated in 20 C.F.R. part 404, subpart P, appendix 1 (Listed Impairments).

If the Commissioner proceeds beyond Step Three, she must assess the claimant's residual functional capacity (RFC).  The claimant's RFC is an assessment of the sustained, work-related physical and mental activities the claimant can still do on a regular and continuing basis despite his limitations.  20 C.F.R. §§ 404.1520(e), 416.920(e).  *See also* Social Security Ruling (SSR) 96-8p.  "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent schedule."  SSR 96-8p, at *1.  In other words, the Social Security Act does not require complete incapacity to be disabled.  *Taylor v. Comm'r of Soc.*

6 - OPINION AND ORDER

*Sec. Admin.*, 659 F.3d 1228, 1234-35 (9th Cir. 2011)(citing *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989)).

At Step Four the claimant is not disabled if the Commissioner determines the claimant retains the RFC to perform work he has done in the past.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  *See also Keyser*, 648 F.3d at 724.

If the Commissioner reaches Step Five, she must determine whether the claimant is able to do any other work that exists in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  *See also Keyser*, 648 F.3d at 724-25.  Here the burden shifts to the Commissioner to show a significant number of jobs exist in the national economy that the claimant can perform.  *Lockwood v. Comm'r Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010).  The Commissioner may satisfy this burden through the testimony of a VE or by reference to the Medical-Vocational Guidelines set forth in the regulations at 20 C.F.R. part 404, subpart P, appendix 2.  If the Commissioner meets this burden, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

## **ALJ'S FINDINGS**

At Step One the ALJ found Plaintiff has not engaged in substantial gainful activity (SGA) since his June 29, 2009, alleged onset date.  Tr. 19.  The ALJ found Plaintiff met the

insured status requirements through December 31, 2014.

At Step Two the ALJ found Plaintiff has severe impairments including left ulnar neuropathy, status post bilateral meniscus tear, status post shoulder arthroscopy, left pinky trigger finger, diabetes mellitus, degenerative disc disease, obstructive sleep apnea, bipolar disorder, post-traumatic stress disorder, and personality disorder.  Tr. 19.

At Step Three the ALJ found Plaintiff's impairments do not meet or equal any listed impairment.  Tr. 20.  The ALJ found Plaintiff has the RFC for light work, except he can occasionally climb, kneel, crouch, and crawl.  The claimant can perform only occasional bilateral overhead lifting and simple, routine tasks consistent with a specific vocational preparation level of one or two.  The claimant does not require over-the-shoulder supervision.  He can have occasional contact with co-workers but not any contact with the public.  Tr. 22.

At Step Four the ALJ found Plaintiff is unable to perform any past relevant work.  Tr. 31.

At Step Five the ALJ found Plaintiff is able to perform the occupations of pricer, car-lot attendant, and office cleaner. Tr. 32.


**DISCUSSION**

Plaintiff contends the ALJ erred by (1) failing to act

8 - OPINION AND ORDER

fairly at the administrative hearing, (2) improperly weighing the medical evidence, and (3) failing to formulate an appropriate RFC assessment.

**I.   The ALJ did not act unfairly at the administrative hearing.**

Plaintiff contends the ALJ erred by failing to develop the record fully and by failing to ensure Plaintiff's interests were fairly protected.  He argues the ALJ should have provided him with the opportunity to qualify a friend as his representative at the hearing and should have advised him that the necessary form could be obtained in the adjacent office.  Plaintiff also contends the ALJ erred by failing to advise him that his friend could testify on his behalf.

Plaintiff fired his lawyer, Todd Hammond, before the August 2013 hearing.  Tr. 41.  He was not represented by counsel at the hearing before the ALJ.  Plaintiff brought a friend to the hearing and sought to have the friend represent him "because he is the only person I can trust."  Tr. 41.  Plaintiff thought he had completed the paperwork necessary to appoint his friend to be his representative, but he had not.  Tr. 42.  The ALJ told Plaintiff that "anybody can be a rep if they go through the process, but they can't just pop in here."  Tr. 42.  The discussion between Plaintiff and the ALJ continued as follows:

> CLMT: I thought I was turning in his name . . . .
>
> ALJ: I don't have it.

CLMT: Well, that's what getting represented does for you when you actually have one.  Okay, that's why Mr. Hammond and I no longer work with each other.  I haven't had any contact with him in a year, over a year, a year-and-a-half.

ALJ: Okay, I – – it's, it's entirely your decision to fire him, hire him.

CLMT: Let's just go ahead and get this over with, sir.

ALJ: Okay.

CLMT: Thank you, I mean, Your Honor.  I'm sorry.  I'm kind of nervous.

ALJ: Okay.  That's okay.  So, if you want to go hire somebody else, I'm more than willing to let you do it, but you can't just pop up without going through the process, so what would you rather do?  If you want to proceed, I'm willing . . . .

CLMT: I turned in his name on my application form for my hearing that he was going to be here.  At least I thought I did.  Maybe I omitted that, but I could swear I sent in his name and his address – –

ALJ: Okay.  I'm not saying you didn't – –

CLMT: – – on my application form.

ALJ: You may have, but after you got the new rep, I – – you have – – you've had Mr. Hammond in the paperwork since about February 2012.

CLMT: Yeah.  We haven't had a relationship in – –

ALJ: Yeah, that, that's – –

CLMT: – – a long time.

ALJ: Yeah, that's okay.  People hire and fire reps all the time.  It doesn't matter to me, okay.

CLMT: Yeah.

ALJ: That met – – but I just want you to know you have a right to have a representative.  They have to go

through the process.  Most of the people who appear
before us regularly know how, like Mr. Hammond, know
how to fill out the paperwork.  If you don't, we have
like everything else, the VA, we all have our rules, so
we have to have some process.

CLMT: Yeah.

ALJ: You want to go forward then?

CLMT: Yeah, I believe my medical evidence should speak
for itself, and from all my readings - -

ALJ: Well, you're well trained.  You, you've got - - I
looked at your record, your - - you know the medical
profession well.

CLMT: Yes I do, sir.
ALJ: Okay.  All right, so you want to go ahead.  You
understand you can have a - - you did have Mr. Hammond.
You and he had a disagreement.  You fired him.  So,
you're going ahead without one at this hearing.

Tr. 42-43.

Thereafter the ALJ described the hearing process and

questioned Plaintiff, a medical specialist, and the VE.

**A.  The ALJ did not err by failing to provide Plaintiff
with an opportunity to qualify his representative.**

Plaintiff argues the ALJ erred by failing to advise

Plaintiff that he could "qualify" his friend as his

Representative by completing a form or an equivalent written

statement.  HALLEX I-1-1-11.A.[2]  Plaintiff cites the ALJ's

"special duty to fully and fairly develop the record and to

---

[2] SSA *Hearings, Appeals, and Litigation Law Manual,* a
publication that provides guidelines as to how ALJs are to handle
various aspects of the disability appeals process.
https://www.ssa.gov/OP-Home/hallex/hallex.html

11 - OPINION AND ORDER

ensure that the claimant' interests are protected." *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983).  "An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes,* 276 F.3d at 459-60. The record reflects Plaintiff knew he had the right to have a representative at the hearing.  Plaintiff, however, failed to ensure that his representative was properly credentialed.  The ALJ properly found Plaintiff failed to complete the paperwork necessary to qualify Plaintiff's friend to be his representative.

On this record the Court concludes the fact that the ALJ did not offer Plaintiff further information or an opportunity to complete the necessary paperwork to qualify his friend to be his representative did not violate the ALJ's duty to develop the record and to protect the claimant's interests.

**B.  The ALJ did not err by failing to advise Plaintiff that his friend could testify.**

Plaintiff cross-examined the VE and delivered a summary at the end of the hearing.  Tr. 87-92.  In the course of his summary Plaintiff stated he "felt I had a representative that could at least testify to my medical abilities that I had when I had them, and what I've been doing since then . . . ."  Tr. 91.  Plaintiff contends the ALJ erred by failing to develop the record when he did not tell Plaintiff that his friend could be called to testify.

The ALJ's duty to develop the record is "triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari,* 276 F.3d 453, 459-60 (9th Cir. 2001). In this case the ALJ had more than 1200 pages of medical records, Plaintiff's testimony, and the testimony of the medical expert. The record, therefore, was not "inadequate to allow for proper evaluation of the evidence." Moreover, Plaintiff does not point to any ambiguity in the evidence.

On this record the Court concludes the ALJ did not err when he did not advise Plaintiff that he could call his friend to testify.

**C. The ALJ did not err by asking leading questions.**

Plaintiff contends the ALJ asked the medical expert, Sally Clayton, L.C.P., leading questions to obtain the "'non-disabling' functional limitations desired." Pl.'s Br. at 8.

To succeed in a claim "that the ALJ did not impartially assess the evidence . . . [a claimant] must show that the ALJ's behavior, in the context of the whole case, was so extreme as to display clear inability to render fair judgment." *Bayliss v. Barnhart,* 427 F.3d 1211, 1214-15 (9th Cir. 2005)(internal quotations omitted)(quoting *Rollins v. Massanari,* 261 F.3d 853, 858 (9th Cir. 2001)). This Court "must begin with a presumption that the ALJ was unbiased," which can only be rebutted "by

13 - OPINION AND ORDER

showing a 'conflict of interest or some other specific reason for disqualification.'"  *Id.*

The Court notes Plaintiff has not identified a conflict of interest or any other specific reason to disqualify the ALJ, and the record does not reflect evidence of bias on the part of the ALJ.  On this record the Court concludes the ALJ did not err by asking leading questions of the medical expert.

In summary, the Court concludes for these reasons the ALJ did not act unfairly at the administrative hearing.

**II.  The ALJ erred by improperly assessing the medical evidence.**

Plaintiff contends the ALJ erred by improperly weighing the medical evidence.

Disability opinions are reserved for the Commissioner.  20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1).  If there is not a conflict between medical source opinions, the ALJ generally must accord greater weight to the opinion of a treating physician than that of an examining physician.  *Lester*, 81 F.3d at 830.  More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and to observe the patient as an individual.  *Orn v. Astrue,* 495 F.3d 625, 632 (9th Cir. 2007).  In such circumstances the ALJ should also give greater weight to the opinion of an examining physician over that of a reviewing physician.  *Id.*  If a treating or examining physician's opinion is not contradicted by another physician, the

ALJ may only reject it for clear and convincing reasons. *Id.*
(treating physician); *Widmark v. Barnhart,* 454 F.3d 1063, 1067
(9th Cir. 2006)(examining physician).

Even if one physician is contradicted by another physician,
the ALJ may not reject the opinion without providing specific and
legitimate reasons supported by substantial evidence in the
record. *Orn,* 495 F.3d at 632; *Widmark,* 454 F.3d at 1066. The
opinion of a nonexamining physician by itself is insufficient to
constitute substantial evidence to reject the opinion of a
treating or examining physician. *Widmark,* 454 F.3d at 1066 n.2.
The ALJ may reject physician opinions that are "brief,
conclusory, and inadequately supported by clinical findings."
*Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

**A. Opinion of Satyanarayana Chandagiri, M.D., Treating Physician**

Dr. Chandagiri, a psychiatrist at the Veterans Affairs
Medical Center, began treating Plaintiff in September 2012. On
July 22, 2013, Dr. Chandagiri conducted a disability evaluation
"to record the extent of impairment and disability due to
[Plaintiff's] various mental health conditions that resulted in
[Plaintiff's] inability to hold a job since June 1, 2009."
Tr. 1434. Dr. Chandagiri noted Plaintiff was alert and oriented
with impaired memory. Plaintiff also had a Saint Louis
University Mental Status Examination (SLUMS) score of 26, which
indicated mild cognitive disorder. Tr. 1435. Dr. Chandagiri

15 – OPINION AND ORDER

found Plaintiff has pressured speech, is easily distracted, and
exhibits a stable but anxious mood.  Dr. Chandagiri opined
Plaintiff "remains very severely disabled for complex medical and
psychiatric reasons and will not be able to hold any
gainful employment in any capacity permanently."  Tr. 1435.
Dr. Chandagiri also opined Plaintiff's disability is likely
to last for more than 12 months and has existed for the last
several years, and he noted Plaintiff had been treated in the
clinic since 2002.

Dr. Chandagiri stated Plaintiff has been diagnosed with
PTSD, Bipolar disorder type 1 recurrent recent episode manic or
mixed, Personality disorder NOS, Cognitive disorder NOS, past
head injuries, obstructive sleep apnea, chronic pain, and knee
injury.  He found Plaintiff's conditions "interfere with his
ability to perform basic activities of daily living that are
essential to any work place."  Tr. 1436.  Dr. Chandagiri
administered the PCL C test for PTSD on which Plaintiff scored
69, "thus indicating high levels of ongoing symptoms of PTSD."
Tr. 1436.  Dr. Chandagiri also administered the World Health
Organization Disability Assessment Schedule 2.0 (WHODAS 2.0) on
which Plaintiff scored 134 indicating "full disability."
Tr. 1436.

Dr. Chandagiri reported Plaintiff's

    severe anxiety, avoidance response, ideas of
    reference, paranoia, tendency to misinterpret

> others motive, anger and rage prevents him from
> going out of his home on his own.  He describes
> quick anger and rage and describes instances of
> severe road rage and avoidance is a way to
> compensate for his poor ability to modulate his
> anger, rage and risk for violence.  He has a car
> but seldom drives more than two to three blocks
> and avoids going further away from home or going to
> new places, crowded roads.  He fears using public
> transportation and hence he avoids using them.
> He gets easily agitated and fears using public
> transport or asking anyone else to give him a ride.

Tr. 1436.

Dr. Chandagiri stated Plaintiff cannot sit still for over 30 minutes without becoming agitated unless he is at home.  He avoids new places and crowds and cannot stand for long periods in a public place.  He cannot walk more than one-half mile and does not even go out to meet his daughter.

Dr. Chandagiri noted Plaintiff's symptoms cause social isolation from friends, family, and former colleagues.  Plaintiff avoids conversations with strangers.  Dr. Chandagiri stated

> [m]ost conversations agitate him and he starts
> to have severe emotional dysregulation,
> agitation and anxiety.  He avoids hospitals,
> doctors offices, law enforcement officials as
> they are all reminders of his traumatic experiences
> when he worked as a Nurse in the prison system.  The
> traumatic memories trigger thoughts of violence and
> his past experiences.
>
> He cites multiple work related triggers, loud
> noise, certain TV shows become too distressing
> and he becomes agitated, loud, restless and he
> describes as having a short fuse, ill tempered
> and angry and later he has rage for over several
> days.  He finds it hard to meet the usual social
> expectations of waiting for his turn, listening
> and reciprocal conversation with the situation

emotionally dysregulating him and he ends up
with severe rage, emotional outburst.

He experiences paranoia, ideas of reference,
triggers self critical thoughts and this in turn
leads to avoidance response.

He continues to have significant problems with
memory.  He cannot remember simple instructions
including names, telephone numbers, dates and
appointments, times to pay bills, complete his
tax papers.  He has difficulty filling out simple
forms, applications as he becomes very agitated,
restless, this tends to trigger flashbacks, anger
outbursts.  His concentration is poor.  Gets dis-
tracted easily.  He has avoided completing a
narrative that was asked of him to fill out the
description of his current functioning.  He has
avoided tasks or postponed completing the tasks
and has difficulty in self regulation, time
management and identifying clear priorities.  He
cannot plan and manage his own money.

* * *

His ongoing mood instability, impulsivity, poor
social functioning, poor self care, poor hygiene,
avoidance, hyper vigilance, poor emotional regu-
lation, being triggered by loud sound, perceived
harm tendency to blame and overreact emotionally
with intense anger, anxiety or sex addict like
behaviors when manic has made it difficult for
him to interact with others, tolerate any friends
or family, go out and volunteer or apply for any
job.  He is unable to withstand customary delays
in scheduling to the extent he reacts with severe
agitation and fears the worse scenario.  This often
takes several days and weeks for him to reset
himself.  In extreme cases he has become suspicious
of the motives of others.  He is isolated.  He is
unable to work as a team player.  He will not be
able to work in any team setting, deal with co-
workers, take instructions and remember the
instructions, tolerate any stress or challenges
in work like situations or learn any new skills or
be flexible.

Tr. 1437.

18 - OPINION AND ORDER

Dr. Chandagiri opined Plaintiff's limitations satisfy the criteria of a Social Security Listed Impairment with demonstrated loss of cognitive functioning, affective lability, mood changes, personality changes, thinking errors, and memory problems. He found Plaintiff has persistent difficulties in activities of daily living and repeated that Plaintiff was permanently disabled and unable to work in any full-time work or work-like setting. Tr. 1438.

The ALJ noted Dr. Chandagiri's opinion and stated it "is not given great weight." Tr. 30. The ALJ found Dr. Chandagiri's conclusion unpersuasive "because it does not address the claimant's specific functional abilities, but is a conclusion regarding the ultimate issue of disability, which is expressly reserved to the Commissioner." Tr. 29-30. The ALJ stated:

> In addition, Dr. Chandagiri's statement was based in large part on the claimant's responses to subjective scales, and as noted above, mental status examination findings have been largely unremarkable. Finally, the activities documented in the record establish greater functioning than assessed by Dr. Chandagiri. Because the statement is not well supported or consistent with the record as a whole, which contains relatively unremarkable findings, it is not given great weight.

Tr. 30.

### 1. Mental-Status Examinations

To support his opinion that Plaintiff is not disabled, the ALJ relies on multiple records documenting unremarkable mental-status examinations. Some of those records, however, are

19 - OPINION AND ORDER

not mental-health examinations, but rather reflect examinations by providers and emergency-room personnel for Plaintiff's knee and back impairments. *See* Tr. 308, 412, 420, 425, 431, 433-34, 444, 514, 517, 520, 578, 593-94, 596, 599, 690, 743, 758, 761, 763, 801, 809. Several of the ALJ's citations also refer to duplicates of records previously cited. *See* Tr. 1062, 1150, 1163, 1166, 1169, 1269.

The ALJ points to Plaintiff's mental-health outpatient counseling notes from November and December 2009 and November 2010 in which Plaintiff reported continued difficulty in regulating his mood and presented with rapid speech and tangential thoughts. Tr. 483, 534. In the 2010 note Plaintiff describes experiencing anxiety and depression. Tr. 528. The ALJ also cites December 2009 and March 2011 notes from Gregory V. West, M.D., Plaintiff's primary-care physician, in which the doctor notes Plaintiff was appropriate, cooperative, and had normal insight and judgment. Tr. 458, 525-26, 822. Dr. West also found Plaintiff's PTSD screen was positive and referred him to undergo a mental-health evaluation. Tr. 525-26. The ALJ also cites a January 2011 mental-health evaluation in which Plaintiff's judgment appeared grossly intact, but the examining provider diagnosed an adjustment disorder. Tr. 783-84. In addition, the ALJ cites a December 2011 treatment note from Elizabeth Fernandez, M.D., in which she noted Plaintiff "seemed

euthymic and not much pressured speech today." Tr. 1100.

The ALJ, however, also references a psycho-diagnostic

examination from September 2011 in which B. Scot Cook, Psy.D.,

records "strong eye contact" with a rambling speaking manner and

"obviously some issues with short-term and working memory as well

as mathematical skills." Tr. 967. Dr. Cook diagnosed Plaintiff

with Bipolar I Disorder, depressed; PTSD, and Adjustment Disorder

with Anxiety. Tr. 970. He assessed Plaintiff with a GAF score

of 36.[3] The ALJ also refers to a March 2012 Mental Status

Examination by Dr. Cook. Tr. 974. Dr. Cook stated Plaintiff

would be "hard pressed to maintain a regular schedule, relate to

workers or superiors, carry out instructions, cope with work-

related stress and setbacks, solve minor problems with people or

duties, or modulate his emotions when required." Tr. 976.

Dr. Cook assessed Plaintiff with a GAF of 35. Finally, the ALJ

---

[3] Although the fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* issued May 27, 2013, abandoned the GAF scale in favor of standardized assessments for symptom severity, diagnostic severity, and disability (*see Diagnostic and Statistical Manual of Mental Disorders V* (DSM-V) 16 (5th ed. 2013)), at the time of Plaintiff's assessment and the ALJ's opinion the GAF scale was used to report a clinician's judgment of the patient's overall level of functioning on a scale of 1 to 100 (*see Diagnostic and Statistical Manual of Mental Disorders IV* (DSM-IV) 31-34 (4th ed. 2000)). In the fourth edition, a GAF of 31 to 40 indicated some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

cites a July 2013 mental-status examination by Dr. Cook, who reported Plaintiff made strong eye contact and that his dress, grooming, and hygiene were adequate. Tr. 1552. Dr. Cook, however, concluded there were not any "substantive changes in his presentation or functional levels since my initial meeting with this man in 2011. Once again, it is difficult to conceive of any work-setting or employer that could work within Mr. Anderson's limitations." Tr. 1554. Thus, Dr. Cook concluded, like Dr. Chandagiri, that Plaintiff was not able to maintain employment.

On this record the Court concludes the ALJ's discounting of the opinion of Dr. Chandagiri, Plaintiff's treating physician, on the basis of the opinions of Drs. West and Fernandez and other unidentified medical sources is not a legally sufficient reason supported by substantial evidence in the record for doing so.

## 2. Activities of Daily Living

The ALJ also finds Dr. Chandragiri's conclusion that Plaintiff has extreme limitations in social functioning is inconsistent with Plaintiff's level of activity and social interaction. Tr. 30.

The ALJ cited the January 2011 mental-health examination by Mark Dillon, Ph.D. Tr. 411-14. Dr. Dillon noted Plaintiff reported watching two or three television shows a day

and would only watch comedies.  Tr. 412.  Plaintiff told
Dr. Dillon that he spent his time working on his house and
looking for jobs on the internet.  He reported he and his fiancé
go out to dinner about once a month, and he does laundry,
cleaning, and work in the kitchen.  He cleaned and organized the
shop and the garage and added he was particularly active around
the house because he was preparing it for sale.  Plaintiff
reported he enjoyed camping, having friends over, barbeques, and
attending dinner parties.  He stated "he primarily has friends
from work, and has seen them less in the last year."  Tr. 412.
Dr. Dillon concluded Plaintiff's "social functioning has
decreased at this point."  Tr. 414.

        The ALJ also noted Plaintiff's September 2011 report to
Dr. Cook.  Tr. 27.  At that time Plaintiff reported a shower and
breakfast routine, after which he searched for jobs online;
checked his email; and performed light cooking, cleaning,
laundry, dishes, and household chores.  Tr. 969.  Plaintiff said
he refrained from tasks involving lifting, pushing, pulling, or
other demanding physical chores.  He no longer felt capable of
hunting, fishing, or camping.  "Socializing is largely limited to
telephone conversations with friends.  He makes some social
contact via regular church attendance."  Tr. 969.

> Mr. Anderson pointed out during [the] interview
> that he felt previous reports of his social
> activities and functioning have overestimated
> his capabilities, essentially depicting him

23 - OPINION AND ORDER

as socially engaged and actively participating
with others to a routine and normal degree.
According to him, it would be more accurate to
say that his social activities were normal and
routine until 3 years ago but since that time
he has felt himself to be largely socially
avoidant, not trusting of people, generally
staying home to keep his social anxiety to a
minimum.  His daily routine is largely consumed
by tinkering on the computer or with small

household projects, and going to occasional
appointments.

Tr. 969.

The ALJ noted Plaintiff exercised on a daily basis
including "minor weight lifting" and walking two miles.  Tr. 27.
Plaintiff, however, reported in November 2012 that he walked
two miles a day "depend[ing] on how bad knees are feeling)."
Tr. 1515.

On this record the Court concludes the ALJ's
determination that Plaintiff's activities are inconsistent with
Dr. Chandragiri's opinion is not supported by substantial
evidence and are not legally sufficient reasons for the ALJ to
reject the opinion of Dr. Chandragiri, Plaintiff's treating
physician.

In summary, the Court concludes the ALJ erred when he only
gave some weight to the opinion of Plaintiff's treating
physician, Dr. Chandragiri, because the ALJ did not provide
legally sufficient reasons supported by substantial evidence in
the record for doing so.

24 – OPINION AND ORDER

**B.  Opinions of Cartel Kennemer, Psy.D., and Robert Henry, Ph.D., Reviewing Physicians**

Dr. Kennemer reviewed Plaintiff's medical records and opined in December 2011 that Plaintiff had moderate limitations in his ability to understand, to remember, and to carry out detailed instructions; to maintain attention and concentration for extended periods; and to interact appropriately with the general public.  Tr. 104-06.  Dr. Henry reviewed Plaintiff's medical records in July 2012 and agreed with Dr. Kennemer.  Tr. 120-21. Both psychological consultants stated Plaintiff was able to "understand, remember, and carry out short instruction (1-2 steps).  [Claimant] is not able to understand, remember, and carry out more detailed instructions, so tasks should be broken down into simple task sequences."  Tr. 104, 120.  The consultants' opinion regarding "one to two step instructions" is uncontradicted.  The ALJ gave some "weight" to the reviewing consultants.  Tr. 29.

The ALJ found Plaintiff "can perform simple, routine tasks consistent with a specific vocational preparation (SVP) level of 1 or 2," but he did not adopt the limitation articulated by the reviewing consultants to "one to two step" instructions.  Tr. 22. Moreover, the ALJ did not provide any specific reasons supported by substantial evidence in the record for rejecting the reviewing consultants' opinions as to Plaintiff's limitation to "one to two step" instructions.

25 - OPINION AND ORDER

In addition, an RFC limitation that specifically requires "one or two step instructions" is inconsistent with SVP level 2. This phrasing is "a nearly verbatim recital" of the definition of reasoning level 1. *See Dictionary of Occupational Titles (DOT)* App'x C (9th ed. 1991)(*available at* 1991 WL 688702) definition of reasoning level 1. *See also Whitlock v. Astrue,* Case No. 3:10-cv-357-AC, 2011 WL 3793347, at *5 (D. Or. Aug. 24, 2011).

On this record the Court concludes the ALJ erred by failing to incorporate into Plaintiff's RFC the reviewing consultants' assessment of Plaintiff as being limited to "one to two step" instructions, and, as a result, the ALJ posed an inaccurate hypothetical to the VE at Step Five.


## REMAND

The decision whether to remand for further proceedings or for immediate payment of benefits generally turns on the likely utility of further proceedings. *Harman v. Apfel*, 211 F.3d 1172, 1179 (9th Cir. 2000). When "the record has been fully developed and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004).

The decision whether to remand this case for further proceedings or for the payment of benefits is a decision within

the discretion of the court.  *Harman*, 211 F.3d 1178.

The Ninth Circuit has established a three-part test "for determining when evidence should be credited and an immediate award of benefits directed." *Harman*, 211 F.3d at 1178.  The court should grant an immediate award of benefits when

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting . . . evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id.*  The second and third prongs of the test often merge into a single question:  Whether the ALJ would have to award benefits if the case were remanded for further proceedings.  *Id.* at 1178 n.2.

This Court has determined the ALJ erred when he rejected the opinions of Drs. Kennemer, Henry, and Chandragiri.  If credited, those opinions establish Plaintiff is disabled.  Thus, the Court concludes Plaintiff is disabled based on this record and that no useful purpose would be served by a remand of this matter for further proceedings.  *See Harman,* 211 F.3d at 117.


<u>CONCLUSION</u>

For these reasons, the Court **REVERSES** the decision of the Commissioner and **REMANDS** this matter to the Commissioner pursuant to Sentence Four, 42 U.S.C. § 405(g), for the immediate

calculation and payment of benefits to Plaintiff.

IT IS SO ORDERED.

DATED this 14th day of July, 2016.


                                   /s/ Anna J. Brown

                              _____
                              ANNA J. BROWN
                              United States District Judge